IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

|  |  |  |
|---|---|---|
| VIRGINIA WRIGHT ARTHUR,<br>    Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil No. 3:17cv285 (HEH) |
| | ) | |
| NANCY A. BERRYHILL,<br>Acting Commissioner of Social Security,<br>    Defendant. | ) | |
| | ) | |
| | ) | |

REPORT AND RECOMMENDATION

On March 5, 2012, Virginia Arthur Wright ("Plaintiff") applied for Social Security

Disability Benefits ("DIB") under the Social Security Act ("Act"), alleging disability from

asthma, chronic obstructive pulmonary disorder ("COPD"), psoriasis of the hands, cardiac

problems, high blood pressure, knee problems and depression, with an alleged onset date of May

18, 2011. The Social Security Administration ("SSA") denied Plaintiff's claim initially and

upon reconsideration. Thereafter, an Administrative Law Judge ("ALJ") denied Plaintiff's claim

in a written decision. The Appeals Council remanded Plaintiff's claim to an ALJ for review. On

rehearing, the ALJ again denied Plaintiff's claim in a written decision. The Appeals Council

denied Plaintiff's subsequent request for review, rendering the ALJ's decision as the final

decision of the Commissioner.

Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g),

arguing that the ALJ erred in failing to accord proper weight to her treating physician's opinions,

failing to properly consider her psoriatic arthritis and resulting limitations in handling objects,

omitting reference to Plaintiff's fibromyalgia and finding that Plaintiff could perform her past

relevant work. (Mem. in Supp. of Pl.'s Mot. For Summ. J. & Mot. To Remand ("Pl.'s Mem.") (ECF No. 15) at 3-21.) This matter now comes before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on the parties' cross-motions for summary judgment, rendering the matter ripe for review.[1] For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 13) and Motion to Remand (ECF No. 14) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 16) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

## I.   PROCEDURAL HISTORY

On March 5, 2012, Plaintiff filed an application for DIB with an alleged onset date of May 18, 2011. (R. at 118-19.) The SSA denied these claims initially on June 12, 2012, and again upon reconsideration on August 2, 2012. (R. at 118, 130.) At Plaintiff's written request, the ALJ held a hearing on September 5, 2013. (R. at 146.) On November 27, 2013, the ALJ issued a written opinion, denying Plaintiff's claim and concluding that Plaintiff did not qualify as disabled under the Act, because she could perform her past relevant work. (R. at 146-62.) On February 25, 2015, the Appeals Council remanded the case to the ALJ to reconsider the treating physician's opinion, reconsider Plaintiff's maximum residual functional capacity ("RFC") and, if warranted, obtain expert vocational evidence. (R. at 170-71.)

On September 9, 2016, the ALJ issued a new written opinion, again denying Plaintiff's claims and concluding that Plaintiff did not qualify as disabled under the Act, because Plaintiff

---

[1]   The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

could perform her past relevant work. (R. at 7-30.) On February 27, 2017, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final decision of the Commissioner subject to review by this Court. (R. at 1-6.)

## II.    STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court "will affirm the Social Security Administration's disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a preponderance, and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)). To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). In considering the decision of the Commissioner based on the record as a whole, the court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The

3

Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 477. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

The Social Security Administration regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. § 404.1520(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity. § 404.1520(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. § 404.1520(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. § 404.1520(a)(4)(iii). Between steps three and four, the ALJ must assess the claimant's RFC, accounting for the most that the claimant can do despite her physical and mental limitations. § 404.1545(a). At step four, the ALJ assesses whether the claimant can perform her past work given her RFC. § 404.1520(a)(4)(iv). Finally, at step five, the ALJ determines whether the claimant can perform any work existing in the national economy. § 404.1520(a)(4)(v).

### III.    THE ALJ'S DECISION

On August 2, 2016, the ALJ held a hearing during which Plaintiff (represented by counsel) and a vocational expert ("VE") testified. (R. at 43-69.) On September 9, 2016, the ALJ issued a written opinion, finding that Plaintiff did not qualify as disabled under the Act. (R. at 7-21.)

4

The ALJ followed the five-step evaluation process established by the Act in analyzing Plaintiff's disability claim. (R. at 12-21.) At step one, the ALJ determined that Plaintiff did not engage in substantial gainful activity between her alleged onset date of May 18, 2011, and her date last insured of June 30, 2016. (R. at 12-13.) At step two, the ALJ found that Plaintiff had the following severe impairments:  degenerative disc disease; osteoarthritis; chronic pain syndrome; and, obesity.  (R. at 13-14.) At step three, the ALJ determined that none of Plaintiff's impairments or combination of impairments met or medically equaled the impairments listed in the regulations.  (R. at 14-16.)

In assessing Plaintiff's RFC, the ALJ found that Plaintiff could perform light work, except that she used a cane to stand and ambulate.  (R. at 16.)  Plaintiff could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs.  (R. at 16.)  Plaintiff could frequently handle and finger, and have frequent exposure to respiratory irritants.  (R. at 16.)  She could have occasional exposure to workplace hazards, but Plaintiff could never climb ladders, ropes or scaffolds.  (R. at 16.)  At step four, the ALJ found that Plaintiff could perform her past relevant work as a medical social worker/assessor as generally performed.  (R. at 20.)  Therefore, Plaintiff did not qualify as disabled under the Act.  (R. at 20-21.)

## IV.    ANALYSIS

Plaintiff, sixty-seven years old at the time of this Report and Recommendation, previously worked as a medical social service worker and hospice social worker.  (R. at 351.) She applied for Social Security Benefits, alleging disability from asthma, COPD, psoriasis of the hands, cardiac problems, high blood pressure, knee problems and depression, with an alleged onset date of May 18, 2011.  (R. at 119.)  Plaintiff's appeal to this Court alleges that the ALJ erred in (1) failing to accord proper weight to her treating physician's opinions; (2) failing to

properly consider her psoriatic failing and resulting limitations in handling objects; (3) omitting reference to Plaintiff's fibromyalgia; and, (4) finding that Plaintiff could perform her past relevant work as generally performed.  (Pl.'s Mem. at 3-18.)   For the reasons set forth below, the ALJ did not err in her decision.

## I.   The ALJ Did Not Err in Evaluating the Opinions of Plaintiff's Treating Physician.

Plaintiff argues that the ALJ erred in affording little weight to the opinions of Plaintiff's treating physician, Steven Spence, M.D.  (Pl.'s Mem. at 4-18).  Plaintiff further maintains that the ALJ failed to properly consider the regulatory factors set forth in 20 C.F.R. § 404.1527(c), which govern the evaluation of a treating source's opinion.  (Pl.'s Mem. at 17-18.)  Defendant responds that the ALJ properly considered Dr. Spence's opinions, and that substantial evidence supports the ALJ's decision.  (Mem. in Supp. of Def.'s Mot. For Summ. J. ("Def.'s Mem.") (ECF No. 16) at 14-18.).)

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments, that would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluations that have been ordered. 20 C.F.R. §§ 404.1512, 404.1527.  When the record contains a number of different medical opinions, including those from Plaintiff's treating sources, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence.  § 404.1527(c).  If, however, the medical opinions are inconsistent internally with each other or other evidence, the ALJ must evaluate the opinions and assign them respective weight to analyze properly the evidence involved.  §§ 404.1527(c)(2)-(6), (d).

6

Under the applicable regulations and case law, a treating source's opinion must be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. § 404.1527(c)(2); *Lewis v. Berryhill*, 858 F. 3d 858, 867 (4th Cir. 2017); *Craig*, 76 F.3d at 590; SSR 96-2p.[2] Further, the regulations do not require that the ALJ accept opinions from a treating source in every situation, e.g., when the source opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the treating source's opinion is inconsistent with other evidence or when it is not otherwise well-supported. §§ 404.1527(c)(3)-(4), (d).

Courts generally should not disturb an ALJ's decision as to the weight afforded a medical opinion absent some indication that the ALJ "dredged up 'specious inconsistencies.'" *Dunn v. Colvin*, 607 F. App'x 264, 267 (4th Cir. 2015) (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)). Indeed, an ALJ's decision regarding weight afforded a medical opinion should be left untouched unless the ALJ failed to give a sufficient reason for the weight afforded. *Id.*

The ALJ must consider the following when evaluating a treating source's opinion: (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4)

---

[2]     Effective March 27, 2017, the SSA rescinded SSR 96-2p, and it no longer applies the "treating physician rule." 20 C.F.R. § 404.1520c (2017). Under the new rule, the SSA will consider the persuasiveness of all medical opinions and evaluate them based upon the two most important factors of supportability and consistency. §§ 404.1520c(a), (c)(1)-(2). Plaintiff filed her claim on March 5, 2012, before this regulation took effect. (R. at 119.) The Agency does not have the power to engage in retroactive rulemaking. *Compare Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (requiring Congress to expressly convey the power to promulgate retroactive rules due to its disfavored place in the law), *with* 42 U.S.C. § 405(a) (granting the Agency the general power to make rules, but not granting retroactive rulemaking power). Because the regulation does not have retroactive effect, the Court will review the ALJ's decision under the old rule codified by 20 C.F.R. § 404.1527.

consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and, (6) any other relevant factors. § 404.1527(c). However, those same regulations specifically vest the ALJ — not the treating source — with the authority to determine whether a claimant is disabled as the Act defines that term. § 404.1527(d)(1). Although the regulations explicitly apply these enumerated factors only to treating sources, those same factors may be applied in evaluating opinion evidence from "other sources." SSR 06-03p.

Dr. Spence treated Plaintiff on multiple occasions between 2010 and 2015 at the Blackstone Family Practice Center. (R. at 556, 567-68, 584, 601, 612, 622, 635, 651, 669, 676, 792, 932, 956, 970, 992, 1070, 1279.) Dr. Spence issued three statements regarding Plaintiff's ability to work. (R. at 558, 1280, 1657-60.) First, on March 15, 2012, Dr. Spence opined that Plaintiff "is clearly disabled at this point from multiple medical issues." (R. at 558.) Second, on December 18, 2015, Dr. Spence drafted a letter, stating that Plaintiff "suffer[ed] from a severe complex combination of medical problems and is totally disabled in my opinion." (R. at 1280.) Dr. Spence then listed Plaintiff's active problems, which included, *inter alia*, depressive disorder, asthma, psoriasis, spinal stenosis of the lumbar region and fibromyalgia. (R. at 1280.) Dr. Spence's letter did not further provide any explanation as to why those impairments rendered Plaintiff disabled or the effects that those impairments had on Plaintiff's ability to work. (R. at 1280.) The ALJ described these two opinions as "conclusory and lack[ing] balance and support by evidence of record." (R. at 19.) Additionally, the ALJ found Dr. Spence's March 2012 and December 2015 opinions internally inconsistent with his own treatment notes from 2012 and 2014. (R. a 19.) Finally, the ALJ noted that the ultimate determination of disability under the Act, "is an issue reserved to the Commissioner." (R. at 19 (citing 20 C.F.R. § 404.1527(e).) Thus, the ALJ afforded these opinions little weight. (R. at 19.)

Finally, the ALJ considered Dr. Spence's Residual Function Capacity Medical Source Statement, dated January 26, 2016. (R. at 19, 1657-60.) In that assessment, Dr. Spence opined that Plaintiff could not work, because she suffered from hand deformities, psoriatic arthritis, osteoarthritis, depression and chronic pain syndrome. (R. at 1657.) Dr. Spence opined that Plaintiff could occasionally lift less than five pounds, rarely lift five pounds and never lift more than five pounds. (R. at 1657.) Because Plaintiff used a cane, Dr. Spence also indicated that she could rarely carry less than five pounds and never carry more than five pounds. (R. at 1658.) According to Dr. Spence, Plaintiff could not walk without rest or severe pain, or climb steps without use of a handrail at a reasonable pace. (R. at 1658.) Dr. Spence opined that Plaintiff needed to elevate her legs for four hours during an eight-hour workday, that she required unscheduled breaks and would be off-task 8% of the time. (R. at 1658-59.) Finally, Dr. Spencer assessed that Plaintiff could use her fingers 90% of the time for fine manipulation, but that she could never use her hands for overhead reaching, grasping, turning or twisting objects. (R. at 1659.) The ALJ also afforded this opinion little weight, because "it lack[ed] balance and consistence with evidence of record as a whole[.]" (R. at 19 (citing, *inter alia*, Plaintiff's normal findings on mental status examinations, positive response to conservative treatment and reported daily activities).)

The ALJ properly considered the factors set forth in § 404.1527(c). Plaintiff argues that ALJ failed to credit Dr. Spence for the duration and frequency of his treatment of Plaintiff, but the ALJ discussed Dr. Spence's treatment records from 2012 and 2014. (R. at 19; Pl.'s Mem. at 17.) Lastly, Plaintiff argues that the ALJ did not adequately consider Dr. Spence's specialization or the consistency between Dr. Spence's opinions and the medical record, because the ALJ did not address "many of the facts" listed in Plaintiff's medical history. (Pl.'s Mem. at 17-18.)

Here, Plaintiff does not identify — nor does the record reflect — any specialization of Dr.

Spence's that the ALJ should have considered. Further, the ALJ specifically discredited Dr.

Spence's opinions, because they lacked balance and consistency with Dr. Spence's own

treatment notes from 2012 and with the evidence of record as a whole. (R. at 19.) Accordingly

the ALJ appropriately considered the regulatory factors. Substantial evidence supports the ALJ's

decision to afford little weight to Dr. Spence's opinions.

### a. Dr. Spence's opinions conflict with his own treatment notes.

As the ALJ noted, Dr. Spence's opinions lack internal consistency with his treatment

notes. (R. at 19.) Dr. Spence listed depressive order or depression as one of the impairments

rendering Plaintiff disabled in both his December 2015 letter and January 2016 medical source

statement. (R. at 1280, 1657.) Yet, Dr. Spence's mental status examinations of Plaintiff

routinely revealed normal results. Plaintiff appeared oriented and in no distress, and she

displayed a normal mood and affect, normal behavior, normal judgment and thought content

during her appointments with Dr. Spence from 2010-2014. (R. at 561, 572-73, 589, 616, 627,

638-39, 654, 671, 677-78, 793, 797, 916, 938-39, 961-62, 975-76, 997, 1009, 1074-75, 1544.)

Even during appointments where Plaintiff reported symptoms of depression, nervousness or

anxiety, Dr. Spence's mental status examinations yielded mostly normal results. (R. at 605, 670-

71, 916-17, 1543-44.) Further, Dr. Spence's treatment notes described Plaintiff's depression as

stable with medication. (R. at 557, 586, 793.)

Dr. Spence also identified asthma as an impairment rendering Plaintiff disabled. (R. at

1280.) Plaintiff suffered from bronchitis in May 2010, April 2011, May 2011 and July 2012. (R.

at 602, 616, 624, 677, 1005.) Otherwise, Dr. Spence's treatment notes describe Plaintiff's

asthma as not exacerbated when she remained compliant with her medication. (R. at 557, 570, 586, 637, 794, 935, 958, 972-73, 993.)

Dr. Spence's physical examinations of Plaintiff showed that she usually displayed a normal range of motion in the neck and no edema. (R. at 19, 572-73, 589, 605-06, 616, 627, 677-78, 916-17, 961-62, 975-76, 997, 1009, 1074-75.) The ALJ acknowledged that Dr. Spence observed that Plaintiff exhibited edema and numbness in the left foot due to degenerative disc disease radiculopathy, but this finding alone "does not support finding [Plaintiff] totally 'disabled.'" (R. at 19, 1544.) Indeed, the extreme physical limitations that Dr. Spence imposed on Plaintiff in his medical source statement do not comport with the relatively unremarkable findings made during Plaintiff's physical examinations. (*E.g.*, R. at 1659 (opining that Plaintiff could never use her hands to reach overhead or grasp objects, and must elevate her legs for four hours during an eight-hour workday).)

### b. Dr. Spence's opinions conflict with other evidence documenting Plaintiff's positive response to conservative treatment.

Additionally, Dr. Spence's opinions do not comport with objective medical evidence in the record. Dr. Spence identified psoriatic arthritis, osteoarthritis and chronic pain syndrome as some of Plaintiff's most significant clinical findings, noting that Plaintiff suffered from back, shoulder, foot and hand pain. (R. at 1657.) Yet, Plaintiff's medical records reveal that she received a conservative course of treatment between 2012 and 2016, and that she responded well to a combination of physical therapy, medication and epidural injections.

On March 21, 2012, Plaintiff presented to Steven Fiore, M.D., at Advanced Orthopaedic Centers. (R. at 688-90.) Upon physical examination, Dr. Fiore observed no pain behavior, but noted that Plaintiff experienced joint pain, stiffness and swelling. (R. at 689.) Dr. Fiore diagnosed Plaintiff with lumbar degenerative disc disease, "possibly causing some stenosis and

11

irritation of the S1 root," as well as the numbness in Plaintiff's leg. (R. at 690.) Dr. Fiore

ordered physical therapy and counseled Plaintiff on weight loss, diet and exercise. (R. at 690.)

On March 27, 2012, Plaintiff presented to Eric Jorde, PT, DPT, OCS, for a physical

therapy session at In Touch Therapy. (R. at 901.) Plaintiff reported that her back complaints had

improved since her third epidural injection that year. (R. at 901.) Although lifting and bending

provoked Plaintiff's symptoms, her home exercise program — which the ALJ noted that Plaintiff

did not always comply with — helped to "control and resolve" her pain. (R. at 17, 901.)

On March 18, 2013, Plaintiff reported to treating staff at Ortho Virginia that she

experienced significant pain reduction after an epidural injection. (R. at 1104.) Specifically,

Plaintiff stated that the injection "helped her 95%." (R. at 1104.) On July 25, 2013, Plaintiff

presented to Joseph Kim, M.D., at Ortho Virginia, complaining of persistent low back pain and

radicular left leg pain. (R. at 1103.) Plaintiff endorsed experiencing some pain relief from her

medication — Gabapentin. (R. at 1103.) She received two more epidural injections from Dr.

Kim on August 8, 2013. (R. at 1101-02.) Dr. Kim noted no complications. (R. at 1101.) On

August 12, 2013, Plaintiff reported to Dr. Spence that Gabapentin, coupled with her most recent

epidural shot, had relieved her spinal stenosis pain. (R. at 1072.)

On December 13, 2013, Plaintiff suffered a setback when she injured her knee. (R. at

1133-34.) Cortisone injections brought Plaintiff no relief, so she underwent a right knee

arthroscopy for a torn meniscus on January 22, 2014. (R. at 1133, 1281-82.) On February 4,

2014, Plaintiff returned to Dr. Jorde for physical therapy. (R. at 1140.) Although Plaintiff

complained of discomfort during certain exercises, Dr. Jorde observed that she returned to her

baseline "within several minutes upon completion of [the exercises.]" (R. at 1140.) Plaintiff

reported that her right leg felt "much better overall, but her pain ha[d] not fully resolved." (R. at

1140.) Two days later, Plaintiff returned to Dr. Kerr at Ortho Virginia. (R. at 1204.) Dr. Kerr observed "marked chondral changes and some continued medial based pain," but described Plaintiff's post-operation status as stable. (R. at 1204-05.) Plaintiff displayed less than a full range of motion, but Dr. Kerr's motor and sensory examinations yielded normal results. (R. at 1204.)

On February 11, 2014, Dr. Jorde observed that Plaintiff walked with an antalgic gait and used an assistive device "in the community" and on uneven surfaces, but not for short distances or at home. (R. at 1146.) Dr. Jorde noted that Plaintiff made "steady progress" during her physical therapy sessions, and he recommended continued rehabilitation to increase her strength and decrease her pain. (R. at 1146.) Near the end of February 2014, Plaintiff fell and suffered from a leg infection. (R. at 1158.) Despite this setback, Dr. Jorde reported that Plaintiff demonstrated "good overall progress" during her physical therapy session on February 25, 2014. (R. at 1158.)

On March 20, 2014, Plaintiff presented to Aarat M. Patel, M.D., at the Arthritis and Osteoporosis Center of Richmond. (R. at 1211.) Dr. Patel prescribed Sulfasalazine for Plaintiff's psoriatic arthritis. (R. at 1213.) Dr. Patel advised Plaintiff on lifestyle changes, diet and exercise to help improve her conditions. (R. at 1213-14.) On May 14, 2014, Plaintiff returned to Dr. Patel, who noted improvement in Plaintiff's hand rash and joint pain since her previous visit. (R. at 1223.) Dr. Patel listed psoriatic arthritis, degenerative arthritis and fibromyalgia as Plaintiff's chief complaints. (R. at 1223.) He assessed that Plaintiff's psoriatic arthritis responded well to the Sulfasalazine and recommended exercise — specifically, aquatherapy — to treat Plaintiff's pain syndrome/FMS. (R. at 1224.)

13

On July 14, 2014, Plaintiff had an aquatherapy session at In Touch Therapy with Harrison Vaughan, PT, DPT, OCS. (R. at 1311-14.) Dr. Vaughan noted that Plaintiff tolerated pool exercises well, and that she would continue to benefit and decrease her pain from more aquatic and land exercises. (R. at 1313.) On August 14, 2014, Plaintiff returned to Dr. Patel, who noted improvement of the psoriasis on Plaintiff's hands and that Plaintiff had a positive response to her psoriatic arthritis medication. (R. at 1241-42.) Dr. Patel recommended continued exercise, joint strengthening and Tylenol to treat Plaintiff's pain syndrome/FMS and osteoarthritis. (R. at 1242.) On August 6, 2014, Dr. Jorde noted that Plaintiff "[was] unable to negotiate the community including [the] grocery store and other daily tasks[;]" however, Plaintiff continued to make steady progress with her physical therapy. (R. at 1335-38.)

On October 27, 2014, Plaintiff had surgery on her left shoulder. (R. at 1371.) On November 7, 2014, Plaintiff returned to In Touch Therapy for a session with Caleb Kauffman, PT, DPT. (R. at 1271-72.) Dr. Kauffman noted that Plaintiff had a limited range of motion, strength and function "due to post-surgical procedures and pain." (R. at 1372.) Despite this pain, Plaintiff showed "good tolerance" to exercises. (R. at 1372.) On January 29, 2015, Plaintiff reported to Dr. Vaughan that she experienced increased back pain but improvement in her shoulder. (R. at 1368.)

On November 9, 2015, Plaintiff presented to Maya Ramos-Allen, PT, DPT, at In Touch Therapy. (R. at 1506.) Plaintiff displayed chronic bilateral knee and low back pain, impaired balance and an abnormal gait. (R. at 1513.) Plaintiff worried about falling due to numbness and pain in her left foot and knee. (R. at 1512.) On December 7, 2015, Dr. Ramos-Allen reported that Plaintiff made good progress toward her functional goals, including improvements in walking. (R. at 1529.) Plaintiff also improved her balance, but she continued to use a cane to

ambulate. (R. at 1529.)  Despite Plaintiff's failure to adhere to her home exercise program, Dr.

Ramos-Allen observed that Plaintiff exhibited good motivation during her sessions. (R. at 1529.)

Although Plaintiff had not met all of her goals, she requested that Dr. Ramos-Allen discharge her

from therapy for the upcoming holidays, so that Plaintiff could "see how she manage[d] on her

own." (R. at 1529.)

Plaintiff returned to Dr. Patel on February 3, 2016 and June 23, 2016. (R. at 1664-65,

1669-81.)  During both visits, Dr. Patel's physical examinations revealed mostly unremarkable

findings. (R. at 1664, 1674.)  In February 2016, Dr. Patel observed chronic osteoarthritis

changes in Plaintiff's upper extremities, but the swelling in Plaintiff's knee had improved. (R. at

1664.)  During both visits, Dr. Patel noted bony prominence over Plaintiff's knees, but no joint

pain. (R. at 1664, 1674.)  Dr. Patel described Plaintiff's psoriatic arthritis as stable with

medications. (R. at 1665, 1674.)  He recommended continued exercise, weight loss, joint

strengthening and Tylenol to treat Plaintiff's pain syndrome/FMS and osteoarthritis. (R. at 1665,

1674.)

Despite experiencing setbacks over the years — including falls and surgeries —

Plaintiff's treatment records show that her pain symptoms and functional abilities improved with

routine treatment that consisted predominantly of medication, physical therapy and epidural

injections.  The ALJ appropriately relied on Plaintiff's history of conservative treatment in

discounting Dr. Spence's opinions. (R. at 19.)

### c. Dr. Spence's opinions conflict with opinions of the state agency physicians.

The opinions of the state agency physicians, Wyatt S. Beazley III, M.D., and Martin

Cader, M.D., also support the ALJ's assignment of little weight to Dr. Spence's opinion. (R. at

125-28, 137-39.)  State agency medical consultants are highly qualified physicians who are

experts in Social Security disability evaluation. 20 C.F.R. § 404.1513a(b)(1). Therefore, when considering the opinion of a state agency medical consultant, the ALJ must evaluate those findings just as he would any other medical opinion. § 404.1513a(b)(1). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ is required to explain the weight given to state agency opinions. § 404.1527(e); *see* § 404.1513a.

On June 11, 2012, Dr. Beazley reviewed Plaintiff's medical records and noted that although Plaintiff had asthma, she could still perform the majority of her activities. (R. at 128.) Dr. Beazley further stated that Plaintiff's psoriasis responded well to medication and that, despite occasional feelings of nervousness or depression, she could perform a wide range of work activities. (R. at 128.) Dr. Beazley opined that Plaintiff could frequently climb ramps, stairs, ladders, ropes and scaffolds, and frequently stoop, crouch and crawl. (R. at 125-26.) On August 2, 2012, Dr. Cader opined that Plaintiff could frequently climb ramps and stairs, occasionally climb ladders, ropes and scaffolds, and occasionally stoop, kneel, crouch and crawl. (R. at 138-39.) Both Drs. Beazley and Cader opined that Plaintiff should avoid concentrated exposure to fumes, dusts, gases and poor ventilation. (R. at 126, 139.) Likewise, both state agency physicians found that Plaintiff could perform her past relevant work as a social worker. (R. at 128, 140.)

The ALJ afforded the state agency physicians opinions great weight, because they comported with the evidence of record as a whole, including Plaintiff's positive response to conservative treatment, as discussed above. (R. at 18, 690, 901, 1104, 1529.) The ALJ explained that although neither state agency physician "had the opportunity to examine or treat [Plaintiff]," their "familiarity with the SSA disability evaluation program and the evidence of record warrants the greatest weight." (R. at 18.) The ALJ ultimately crafted a more restrictive

16

RFC than suggested by the state agency physicians. (R. at 16.) The state agency physicians' opinions more closely comport with the balance of the record than Dr. Spence's more restrictive opinions do.

### d. Dr. Spence's opinions conflict with Plaintiff's reported daily activities.

Finally, Plaintiff's own statements support the ALJ's assignment of little weight to Dr. Spence's opinions. In a March 2012 function report, Plaintiff stated that she helped feed outdoor pets. (R. at 386-87.) Plaintiff also regularly checked on her elderly mother-in-law before she passed away. (R. at 386-87, 994.) Plaintiff prepared meals, performed some household chores, drove, shopped for groceries, regularly attended church and ran errands to the gas station, post office and library. (R. at 386-390.) Plaintiff began taking oil painting classes in April and May 2012. (R. at 782, 848.)

Plaintiff argues that her function report "is out of date," and that her condition has worsened since March 2012. (Pl.'s Mem. at 6.) But Plaintiff's more recent treatment records likewise demonstrate that Plaintiff possessed a broader range of functional capability than that opined by Dr. Spence. Following her knee surgery in January 2014, Plaintiff completed a medical history/evaluation for treating staff at In Touch Therapy. (R. at 1297-99.) Plaintiff reported experiencing mild pain when carrying groceries, climbing stairs, lifting children, dressing herself "in certain situations" and with prolonged sitting. (R. at 1299.) Plaintiff endorsed severe pain when performing yard work and moderate pain when bending, performing household chores, kneeling and with prolonged standing. (R. at 1299.) She rated her walking pain between moderate and mild. (R. at 1299.) Plaintiff experienced no pain when driving, feeding herself, taking care of pets or lifting. (R. at 1299.)

17

On January 29, 2015, Plaintiff stated that she performed "pretty much all chores without any problems." (R. at 1368.)  On August 5, 2015, Plaintiff reported doing well and performing more activities "in the yard and around the home." (R. at 1448.)  On September 11, 2015, Plaintiff stated that she "felt like she was dragging" after "cleaning a lot around the house" the previous day. (R. at 1455.)  Specifically, Plaintiff reported that she carried plastic tubs and containers of items up the stairs. (R. at 1455.)  Following a fall in September 2015 (R. at 1433), Plaintiff reported feeling fatigued after a weekend spent "preparing for a family event" for seventeen guests, which involved "a lot of cooking and cleaning." (R. at 1491.)

In November and December 2015, Plaintiff reported difficulty completing all of her household chores, and she expressed frustration that her limitations slowed her down. (R. at 1512, 1528.)  However, in December 2015, Plaintiff did "a lot of walking" and went up and down stairs to get Christmas decorations. (R. at 1528.)  Although Plaintiff reported feeling fatigued from this activity, she felt no increase in pain. (R. at 1528.)  As the ALJ noted, these activities do not comport with the extreme limitations imposed by Dr. Spence.  Accordingly, substantial evidence supports the ALJ's decision to afford Dr. Spence's opinion little weight.

## II.    The ALJ Did Not Err in Evaluating Plaintiff's Psoriatic Arthritis.

Plaintiff argues that the ALJ erred in classifying Plaintiff's psoriatic arthritis as non-severe at step two of the sequential analysis. (Pl.'s Mem. at 18-21.)  Plaintiff further contends that the ALJ's finding "is based on patently unreviewable reasoning," because the ALJ stated her reasoning "in the disjunctive 'or[;]'" therefore, the Court cannot determine which reason the ALJ relied upon to classify Plaintiff's psoriatic arthritis as non-severe. (Pl.'s Mem. at 20-21.)  Finally, Plaintiff argues that her psoriatic arthritis resulted in a "lack of ability to handle objects and use her fingers;" thus, the ALJ should have included such a limitation in the RFC. (Pl.'s

18

Mem. at 21.)  Defendant responds that that the ALJ clearly stated her reasoning, and that substantial evidence supports both the ALJ's step two findings, as well as the RFC.  (Def.'s Mem. at 11, 20-21.)

### a. Substantial Evidence supports the ALJ's finding that Plaintiff's psoriatic arthritis constitutes a non-severe impairment.

At step two, the ALJ must consider the claimant's medically determinable impairments. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1521.  "The Supreme Court has held that this step of the disability evaluation is a *de minimis* threshold." *Williams v. Astrue*, 2010 WL 395631, at *14 (E.D. Va. Feb. 2, 2010), *report and recommendation adopted*, at *1 (citing *Bowen v. Yuckert*, 482 U.S. 137, 146-47 (1987)).

An ALJ satisfies step two by finding a severe impairment and proceeding through the rest of the sequential analysis. *McCormick v. Soc. Sec. Admin., Comm'r*, 619 F. App'x 855, 858 (11th Cir. 2015); *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987) ("[T]he finding of any severe impairment, whether or not it qualifies as a disability and whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe, is enough to satisfy the requirement of step two.")  Plaintiff has the burden of demonstrating that she has an "impairment or combination of impairments which significantly limits [her] physical or mental ability to do basic work activities[.]"  20 C.F.R. § 404.1520(c); *Bowen*, 482 U.S. at 146.  The claimant's impairment "must have lasted or must be expected to last for a continuous period of at least 12 months."  20 C.F.R. § 404.1509.

A severe impairment causes more than a minimal effect on one's ability to function. § 404.1520(c).  Likewise, "[a]n impairment or combination of impairments is not severe if it does not significantly limit [one's] physical or mental ability to do basic work activities."

§ 404.1522(a).  An ALJ will find a claimant not disabled at step two if she "do[es] not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement[.]"  § 404.1520(a)(4)(ii).

Here, the ALJ found that Plaintiff had the following severe impairments:  degenerative disc disease; osteoarthritis; chronic pain syndrome; and, obesity.  (R. at 13.)  By finding that Plaintiff suffered from several severe impairments and continuing through the sequential analysis, the ALJ satisfied step two.  *McCormick*, 619 F. App'x  at 858; *Jamison*, 814 F.2d at 588.  The ALJ also considered, *inter alia*, Plaintiff's psoriatic arthritis, asthma, obstructive sleep apnea, hypertension, anxiety disorder and affective disorder, and found that those impairments constituted non-severe impairments, because "they did not exist for a continuous period of 12 months, were responsive to medication, did not require significant medical treatment, or did not result in any continuous exertional or non-exertional functional limitations."  (R. at 13-14.)

Plaintiff argues that the Court cannot review the ALJ's reasoning here, because she did not specify which of the above stated reasons she relied upon to make a non-severe finding with respect to Plaintiff's psoriatic arthritis.  (Pl.'s Mem. at 20-21.)  However, as Defendant points out, "[i]n the very sentence that follows the listed four possible reasons for finding non-severity," the ALJ stated that "[r]ecords show [Plaintiff's] psoriatic arthritis is described as stable."  (R. at 13; Def.'s Mem. at 21-22.)  Accordingly, the ALJ provided specific reasoning for classifying Plaintiff's psoriatic arthritis as non-severe.  Substantial evidence supports the ALJ's decision.

To support her finding, the ALJ cited to treatment notes from Plaintiff's appointments with Dr. Patel on October 12, 2015; February 3, 2016; and, June 23, 2016.  (R. at 17.)  During each of those appointments, Dr. Patel described Plaintiff's psoriatic arthritis as a "stable disease."

(R. at 1662, 1665, 1674.) Dr. Patel also noted during all three appointments that "Plaintiff remain[ed] stable on her current medications." (R. at 1662, 1665, 1674.) On June 23, 2016, Plaintiff reported to Dr. Patel that she thought "the psoriatic arthritis ha[d] been good." (R. at 1673.)

In addition to the treatment notes cited by the ALJ, other medical records, the opinions of the state agency physicians and Plaintiff's reported daily activities support the ALJ's non-severe finding. On May 14, 2014, Dr. Patel observed that Plaintiff positively responded to Sulfasalazine, which treated her psoriatic arthritis. (R. at 1224.) Dr. Patel noted that the inflammation from the psoriatic arthritis had improved, and he expressed a desire to increase Plaintiff's Sulfasalazine dosage. (R. at 1224.) During a physical therapy session with Dr. Vaughan on September 11, 2014, Plaintiff reported that she felt that her psoriatic arthritis medication "may be helping" her condition. (R. at 1356.) On November 20, 2014, Dr. Patel noted that Plaintiff's psoriatic arthritis responded to a combination of Sulfasalazine and Otezela without any adverse effects. (R. at 1257.) Plaintiff described her psoriatic arthritis as "under control with medication" during another physical therapy session on July 14, 2015. (R. at 1423.)

The opinions of the state agency physicians also support the ALJ's finding that Plaintiff's psoriatic arthritis constituted a non-severe impairment. (R. at 125-128, 137-41.) In June 2012, Dr. Beazley opined that Plaintiff had no manipulative limitations and could perform her past relevant work as a hospice social worker. (R. at 126, 128.) Dr. Beazley noted that "current medical evidence shows that [Plaintiff's] psoriasis has responded to treatment and does not cause any significant limitations." (R. at 128.) In August 2012, Dr. Cader likewise assessed Plaintiff as having no manipulative limitations and capable of performing her past relevant work. (R. at

140-41.) The ALJ afforded the opinions of Drs. Beazley and Cader great weight, because they "[were] most consistent with the longitudinal review of the evidence." (R. at 18.)

Finally, Plaintiff's reported daily activities support the ALJ's step two finding. While Plaintiff argues that her psoriatic arthritis resulted in continuous functional limitation in the use of her hands, Plaintiff reported to her dermatologist that she began taking oil painting classes in April 2012. (R. at 782.) In May 2012, Plaintiff again reported that she "was . . . able to paint" and that her medication for her hands "really helped." (R. at 848.) As Defendant notes, Plaintiff also "completed multiple detailed, handwritten forms in furtherance of her application for benefits." (Def.'s Mem. at 22; *see e.g.*, R. at 351-58 (Work History Report, completed March 2012), 386-93 (Adult Function Report, completed March 2012), 395-402 (Disability Report — Appeal, completed June 2012), 443-47 (Letter to Appeals Council, dated February 2015).) In Plaintiff's March 2012 function report, Plaintiff stated that she helped feed outdoor pets. (R. at 386-87.) Plaintiff also regularly checked on and helped care for her elderly mother-in-law before she passed away. (R. at 386-87, 994.) Plaintiff prepared meals, performed some household chores, drove a car, shopped for groceries and regularly went to church, the gas station, the post office and the library. (R. at 386-90.) These activities demonstrate that Plaintiff retained a broader range of functionality in her hands than the alleged severity of her psoriatic arthritis would suggest. Indeed, the ALJ noted that Plaintiff's described daily activities "[were] not limited to the extent one would expect, given [Plaintiff's] complaints of disabling symptoms and limitations." (R. at 18.) Accordingly, the ALJ did not err in classifying Plaintiff's psoriatic arthritis as a non-severe impairment.

### b. Substantial evidence supports the ALJ's assessment that Plaintiff could frequently manipulate and finger.

After step three of the analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 404.1520(e)-(f), 404.1545(a)(1). In analyzing a claimant's abilities, an ALJ must first assess the nature and extent of the claimant's physical and mental limitations and then determine the claimant's RFC for work activity on a regular and continuing basis. § 404.1545(b). Generally, the claimant bears the responsibility to provide the evidence that the ALJ utilizes in making his RFC determination; however, before making a determination that a claimant is not disabled, the ALJ must develop the claimant's complete medical history, including scheduling consultative examinations if necessary. § 404.1545(a)(3). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that have basis in the claimant's credible complaints. § 404.1545(e). The ALJ must conduct a function-by-function analysis in assessing a claimant's RFC, and remand may be appropriate in cases where the ALJ fails to assess a claimant's capacity to perform relevant functions, or where the ALJ's analysis contains inadequacies that frustrate meaningful review. *Mascio*, 780 F.3d at 635-36. The assessment must include a narrative discussion of how the evidence supports each conclusion, citing specific medical facts and non-medical evidence, including daily activities and observations.

Plaintiff argues that the ALJ erred in failing to account for a limitation in handling objects. (Pl.'s Mem. at 18-19, 21.) However, the ALJ did include such a limitation in Plaintiff's RFC. The ALJ found that Plaintiff could frequently handle and finger. (R. at 16.) The same substantial evidence that supports the ALJ's step two finding regarding the severity of Plaintiff's psoriatic arthritis supports the ALJ's finding that Plaintiff could frequently handle and finger.

23

Plaintiff highlights instances from the record where she experienced hand pain. (Pl.'s Mem. at 19.) For example, on May 14, 2014, Plaintiff complained of pain in her hands during a visit with Dr. Patel. (R. at 1223.) But during that visit, Dr. Patel observed that Plaintiff's hand rash, joint pain and inflammation from her psoriatic arthritis had improved. (R. at 1223-24.) Dr. Patel also noted that Plaintiff's psoriatic arthritis responded well to medication. (R. at 1224.) Indeed, treatment records repeatedly show that medication improved Plaintiff's psoriatic arthritis. (R. at 1224, 1257, 1423, 1662, 1665, 1674.) Plaintiff argues that, "as late as June 23, 2016, [she] complained of arthritis in her hands, and was again diagnosed as having psoriatic arthritis." (Pl.'s Mem. at 19.) However, during that visit, Plaintiff described her psoriatic arthritis as "good," and Dr. Patel described her condition as stable. (R. at 1673-74.) Further, neither state agency physician found that Plaintiff experienced manipulative limitations. (R. at 126, 138.)

Finally, Plaintiff's reported daily activities support the RFC assessment. Although Plaintiff reported difficulty unbuttoning tight buttons, removing lids and getting dressed due to "painful" psoriasis in her fingers, she could still paint, prepare meals, drive a car, grocery shop, perform household chores (e.g., loading the dishwasher) and care for outdoor pets and her elderly mother-in-law. (R. at 387-90, 399, 782, 848, 994.) Accordingly, Plaintiff's "ability to perform a broad range of normal daily activities," coupled with her treatment records and the opinions of the state agency physicians, constitute substantial evidence in support of the ALJ's finding that Plaintiff could frequently handle and finger. (R. at 19.)

### III. The ALJ's Omission of the Word "Fibromyalgia" From Her Decision Does Not Constitute Reversible Error.

Plaintiff argues that the ALJ erred in omitting any mention of Plaintiff's diagnosis of fibromyalgia from her opinion. (Pl.'s Mem. at 18.) Plaintiff asserts that, because "[t]he medical

record contains numerous references to [her] diagnosis of fibromyalgia," the ALJ should have referenced fibromyalgia somewhere in her opinion. (Pl.'s Mem. at 18 (citing R. at 1212, 1222, 1240, 1243, 1266-67, 1280, 1539, 1661, 1664, 1670, 1673.) Defendant responds that the ALJ's consideration and discussion of Plaintiff's chronic pain syndrome encompassed Plaintiff's fibromyalgia. (Def.'s Mem. at 18.)

The regulations provide that the SSA "will always consider the medical opinions in [the claimant's] case record together with the rest of the relevant evidence . . . receiv[ed]." 20 C.F.R. § 404.1527(b). The regulations define "medical opinions" as "statements from acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). Because a medical opinion may include a diagnosis, and accepted medical sources[3] diagnosed Plaintiff with fibromyalgia, Plaintiff argues that the ALJ's "failure to even mention fibromyalgia" shows that the ALJ did not consider Plaintiff's case "with sufficient care." (Pl.'s Mem. at 18 (citing *Keczan v. Colvin*, 2017 WL 252288, at *8 (S.D.W. Va. Jan. 19, 2017).) The district court in *Keczan* held that "the ALJ's failure to address fibromyalgia as an impairment, severe or not, was in error because there was evidence concerning this impairment during the relevant time period." 2017 WL 252288, at *8. Unlike the ALJ in *Keczan*, the ALJ

---

[3]     Licensed physicians constitute acceptable medical sources. 20 C.F.R. § 404.1502(a)(1). Here, both Dr. Spence and Dr. Patel diagnosed Plaintiff with fibromyalgia, chronic pain syndrome and/or pain syndrome/FMS. (*E.g.*, R. at 1212 (Dr. Spence diagnosed Plaintiff with "fibromyalgia"); 1657 (Dr. Spence opined that Plaintiff suffered from chronic pain syndrome); 1674 (Dr. Patel diagnosed Plaintiff with pain syndrome/FMS).)

here did consider Plaintiff's fibromyalgia, but she referred to the impairment as "chronic pain syndrome" or simply as "pain syndrome." (R. at 13, 15, 17.)  Thus, the ALJ did not err.

Throughout the record, Plaintiff's treatment providers referred to her fibromyalgia[4] as "pain syndrome/FMS" or "chronic pain syndrome," and used both terms interchangeably with "fibromyalgia." (R. at 1242-43, 1661-62, 1673-74.)  On August 14, 2014, Nurse Boley diagnosed Plaintiff with fibromyalgia, but referred to Plaintiff's impairment as pain syndrome/FMS in her assessment. (R. at 1242.)  Nurse Boley described Plaintiff's pain syndrome/FMS as an "[e]stablished problem" and a "[p]rogressive disease." (R. at 1242.)  She recommended that Plaintiff continue to exercise and lose weight to treat this condition. (R. at 1242.)  Progress notes dated October 12, 2015 from Dr. Patel list fibromyalgia syndrome under Plaintiff's chief complaints. (R. at 1661.)  However, Dr. Patel used the term pain syndrome/FMS in his assessment of Plaintiff's conditions. (R. at 1661-62.)  Like Nurse Boley, Dr. Patel described Plaintiff's pain syndrome/FMS as an established problem and recommended continued exercise and weight loss. (R. at 1662.)  On June 23, 2016, Plaintiff presented to Dr. Patel at the Bon Secours Arthritis and Osteoporosis Center of Richmond. (R. at 1673-74.)  Again, Dr. Patel listed fibromyalgia syndrome as one of Plaintiff's chief complaints, but noted that Plaintiff suffered from pain syndrome/FMS in his assessment. (R. at 1674.)

Plaintiff points to instances in the record where Dr. Spence diagnosed Plaintiff as suffering from fibromyalgia, without any reference to pain syndrome/FMS. (*See, e.g.*, R. at 1212 (Bon Secours Health System records show that Dr. Spence diagnosed Plaintiff with fibromyalgia on July 23, 2014); 1222 (same); 1240 (same); 1670 (same).)  On December 18, 2015, Dr. Spence

---

[4]     Fibromyalgia refers to "pain and stiffness in the muscles and joints that either is diffuse or has multiple trigger points."  *Fibromyalgia*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

26

included fibromyalgia on a list of impairments that, in his opinion, rendered Plaintiff totally disabled. (R. at 1280.) But when Dr. Spence completed an RFC questionnaire on January 26, 2016, he listed "chronic pain syndrome" — *not* fibromyalgia — when asked to identify Plaintiff's "most significant clinical findings and objective signs." (R. at 1657.) These medical records show that Plaintiff's treatment providers used the terms "pain syndrome/FMS," "chronic pain syndrome" and "fibromyalgia" interchangeably.

Contrary to Plaintiff's contention that the ALJ ignored her fibromyalgia diagnosis, the ALJ discussed Plaintiff's pain syndrome at steps two and three of the sequential analysis, as well as in formulating Plaintiff's RFC. (R. at 13-17; Pl.'s Mem. at 18.) The fact that the ALJ referred to Plaintiff's impairment as "chronic pain syndrome" or simply "pain syndrome," rather than fibromyalgia, does not require remand.

At step two of the sequential analysis, the ALJ identified Plaintiff's chronic pain syndrome as a severe impairment. (R. at 13.) Next, at step three, the ALJ evaluated Plaintiff's chronic pain syndrome under Listings 1.01 (musculoskeletal impairments) and 11.01 (neurological disorders), concluding that Plaintiff did not meet either listing's criteria. (R. at 15.) The ALJ also considered the effect of Plaintiff's chronic pain syndrome in combination with her degenerative disc disease and arthritis under Listings 1.02 (major dysfunction of joints) and 1.04 (disorders of the spine). (R. at 15.) Citing to the record, the ALJ considered x-rays, imaging, Plaintiff's prior knee surgery and instances in the record where Plaintiff exhibited an abnormal gait. (R. at 15.) Ultimately, the ALJ concluded that Plaintiff did not meet the criteria for Listings 1.02 or 1.04 either. (R. at 15.) In support of this finding, the ALJ discussed the lack of abnormalities revealed during Plaintiff's physical examinations, as well as Plaintiff's reported daily activities. (R. at 15.)

27

Finally, in the RFC assessment, the ALJ acknowledged Plaintiff's history of degenerative disc disease, osteoarthritis and chronic pain syndrome, but found that the record as a whole showed "routine treatment and limited abnormality on clinical examination and diagnostic study." (R. at 17.) The ALJ noted that Plaintiff "had a partial response to injections with respect to her pain syndrome and her doctor recommended joint strengthening, exercise and weight loss." (R. at 17.) The ALJ specifically cited to Plaintiff's appointments with Dr. Patel on October 12, 2015 and February 3, 2016. (R. at 17 (citing R. at 1661, 1664).) As stated above, during both those appointments, Dr. Patel listed "[f]ibromyalgia syndrome" as one of Plaintiff's chief complaints, and assessed Plaintiff as suffering from "pain syndrome/FMS." (R. at 1661-64.) Although the term "fibromyalgia" does not appear in the ALJ's opinion, the ALJ appropriately considered Plaintiff's fibromyalgia — both singly and in combination with other impairments — at step two, step three and in formulating the RFC.

## IV.    The ALJ Did Not Err in Finding Plaintiff Capable of Performing Her Past Relevant Work.

Finally, Plaintiff asserts that the ALJ erred in finding that she could return to her past relevant work as a medical social service worker/assessor. (Pl.'s Mem. at 3-4.) Plaintiff presents a two-fold argument. First, she argues that she cannot perform her past relevant work as generally performed, because licensed medical social workers must have a master's degree. (Pl.'s Mem. at 3.) Plaintiff holds a bachelor's degree and states that her former employer grandfathered her into her previous position as a medical social worker. (Pl.'s Mem. at 3-4.) Second, Plaintiff argues that she cannot perform her past relevant work as actually performed, because the ALJ included use of a cane in her RFC. (Pl.'s Mem. at 4.) Defendant responds that Virginia permits licensure of social workers with either a bachelor's or a master's degree and that substantial evidence supports the ALJ's step four findings. (Def.'s Mem. at 11-13.)

28

At step four of the sequential analysis, the ALJ must assess the claimant's RFC and past relevant work to determine if the claimant is able to perform the tasks of her past employment. 20 C.F.R. § 404.1520(a)(4)(iv). In assessing Plaintiff's ability to perform her past relevant work, the Commissioner may rely on the general job categories of the Dictionary of Occupational Titles ("DOT") as presumptively descriptive of a claimant's prior work. *See* SSR 82-61 ("The [DOT] descriptions can be relied upon — for jobs that are listed in the DOT — to define the job as it is usually performed in the national economy."). Moreover, agency rulings specifically contemplate "that some individual jobs may require somewhat more or less exertion than the DOT description." *Id.*

The regulations provide that the ALJ may use the DOT or testimony from a VE to determine the demands of Plaintiff's past relevant work and whether her RFC allows her to perform such work. § 404.1560(b)(2) ("We may use the services of vocational experts or vocational specialists, or other resources, such as the [DOT] . . . to obtain evidence we need to help us determine whether you can do your past relevant work, given your [RFC]."). The test for evaluating Plaintiff's past relevant work experience is not whether she may perform the heightened demands of her actual position, but the demands as generally required by employers throughout the economy. SSR 82-61. "[I]f the claimant cannot perform the excessive functional demands and/or job duties actually required in the former job but can perform the functional demands and job duties as generally required by employers throughout the economy, the claimant should be found to be 'not disabled.'" SSR 82-61.

Relying on the applicable DOT description (DOT No. 195.107-030, 1991 WL 671574), the ALJ determined that Plaintiff could return to her past work as a medical social service worker/assessor as generally performed. (R. at 20.) The ALJ described the job as "sedentary

and skilled," but noted that Plaintiff performed her previous position "at the light exertional level." (R. at 20, 60, 62.) The relevant DOT description does not specifically address the use of a cane. DOT No. 195.107-030. However, the VE testified that, based on his expertise and experience, an individual with Plaintiff's RFC — including the use of a cane to stand and ambulate — could return to work as a medical social service worker/assessor as generally performed. (R. at 20, 60-63.) Plaintiff did not object to the VE's qualifications at the hearing and the ALJ appropriately relied on the VE's testimony in finding Plaintiff capable of performing her past relevant work. (R. at 59); 20 C.F.R. § 404.1560(b)(2).

The Virginia Administrative Code sets forth the education and experience requirements for a licensed social worker. 18 Va. Admin. Code § 140-20-60 (West 2018). The pertinent section provides that, "the applicant shall hold a bachelor's *or* a master's degree from an accredited school of social work." 18 Va. Admin. Code § 14-20-60(A) (emphasis added). Here, Plaintiff received a bachelor's degree in social work, and she also completed most of the coursework required for a master's degree in social work. (R. at 83.) Contrary to Plaintiff's argument, she does not require a master's degree to return to work as a medical social worker/assessor. (Pl.'s Mem. at 3-4.)

Plaintiff also argues that she cannot perform her past relevant work as actually performed, because — as reflected in the RFC — she uses a cane to stand and ambulate. (R. at 16; Pl.'s Mem. at 4.) The Fourth Circuit has explained that at step four of the sequential analysis, the ALJ should find the claimant not disabled if she can "perform [her] past relevant work as [she] performed it in the past *or* as it is generally required by employers in the national economy." *Pass v. Chater*, 65 F.3d 1200, 1207 (4th Cir. 1995). Regardless of Plaintiff's ability to return to her past relevant work as she performed it in the past, the ALJ had grounds to find

Plaintiff not disabled at step four when she found Plaintiff capable of returning to her past relevant work as generally performed. *Id.* Although the relevant DOT does not include the use of a cane, the ALJ appropriately relied on the VE's testimony that a claimant with Plaintiff's RFC could perform Plaintiff's past relevant work as generally performed. (R. at 20.) Thus, the ALJ did not err at step four.

## V.    CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 13) and Motion to Remand (ECF No. 14) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 16) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

Let the clerk forward a copy of this Report and Recommendation to Senior United States District Judge Henry E. Hudson and to all counsel of record.

### NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

_____/s/_____

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date:  June 12, 2018

31